# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

CHESTER WILLIAMS,

    Plaintiff,

v.                                                                                Case No. 3:09cv213/LAC

FLORIDA DEPT. OF CORRECTIONS,

    Defendant.
_____/

## ORDER GRANTING SUMMARY JUDGMENT

Pending before the Court is Defendant's motion for summary judgment (doc. 110) and documents in support thereof. Plaintiff timely filed a memorandum and evidentiary materials in opposition. The Court has taken summary judgment under advisement (doc. 114) and is now prepared to rule. For the reasons stated below, Defendant's motion for summary judgment is granted.

### I. BACKGROUND

Plaintiff Chester Williams, an African-American, filed this action to address adverse employment treatment by the Defendant employer Florida Department of Corrections ("DOC"). Plaintiff raises claims of employment discrimination on the basis of his race under Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act (FCRA), plus a

claim of retaliation for filing a claim of discrimination claim within the employee grievance system.[1]

Plaintiff Williams began working for the DOC as a Correctional Officer in 1986 and attained the rank of Sergeant. Assigned to the Okaloosa Correctional Institute ("OCI"), Williams consistently received positive evaluations of his job performance.

In March and April of 2007, the DOC became aware of an increasing issue with illicit drug use by inmates at OCI after several inmates there had tested positive for drugs. On July 9, 2007, an institution-wide search of inmates and housing areas at OCI uncovered illegal drugs and other forms of contraband such as cell phones, cash, and undershorts that had been modified to enable drugs to be concealed inside them. As a result of this and other subsequent searches between July 9 and 19, 2007, contraband was discovered at four separate locations at OCI, including, as is relevant here, in the areas identified as C-Dorm and D-Dorm. Williams, as a "senior correctional officer" or "correctional sergeant," had supervisory authority over his shift in the C-Dorm. As is also relevant, Officer Joel Taylor held the same supervisory authority over his day time shift in the D-Dorm.[2] Information was obtained to indicate that the contraband had been entering the facility over the weekends when inmates would receive visitors. Williams had no work shifts on the weekends.

---

[1] Plaintiff also raised a claim under the Uniformed Services Employment and Reemployment Rights Act (USERRA), but that claim was dismissed earlier by the Court. Doc. 64.

[2] Williams had more seniority than Sergeant Taylor.

While Williams was employed at OCI, he taught an inmate "Transitions" class,[3] but when he arrived at OCI on the morning of July 11, 2007, to teach a session of the class, he was informed that he could no longer teach the class and was denied a key into the facility by a Colonel Hodgson.[4] Apparently because Williams was scheduled to be on duty as a corrections officer, Hodgson informed him that he was not allowed to perform his "civilian job" as a class instructor. During their conversation, Williams observed that Hodgson became upset over the fact that Williams was not angry or bothered by the recent discovery of contraband at the institution and in the C-Dorm. According to Williams, Hodgson threatened to "move" him, "take" his "job",[5] and/or send him back to "basic recruit training." Doc 126-1, Williams deposition at 20-21. Hodgson made no "racial comments" towards him, however. *Id.* at 26-27.

Williams informed the shift commander, Captain Henderson,[6] about the manner in which Hodgson had treated him, and Henderson said he would talk to Hodgson about it. *Id.* at 27-28. Henderson later informed Williams that she had spoken with Hodgson, and

---

[3] Williams was allowed to teach this class as a part-time employee with Tallahassee Community College.

[4] Evidently, Williams formerly possessed the keys necessary to access the institution at the "center gate," but because of the contraband issue, the locks were changed. Williams therefore asked Colonel Hodgson for the key(s) but was refused.

[5] It is not clear from the record whether the statement that Hodgson would "take his job" meant his correctional officer position or his instructor position.

[6] In a separate "Department of Corrections Discrimination Complaint," only one page of which is provided, the shift supervisor is identified instead as "Captain Brown." Doc. 126-5.

Hodgson responded that he had made his comments in an effort to "motivate him." *Id.* at 28.

Shortly after this incident, Williams, as a member of the Army Reserve at the time, was ordered into active duty for training from July 16 to August 5, 2007. During Williams' absence from OCI, and as part of the ongoing investigation into the presence of contraband at OCI, Warden Alan Pippin, in consultation with DOC Regional Director Wendel Whitehurst and DOC Secretary James McDonough, determined that "staff changes" needed to be made. Doc. 94 at ¶¶ 43-49.[7]

Pippin perceived that part of the problem was that the correctional staff had become "complacent" in their monitoring of the inmates. *Id.* at ¶ 49. Thus, Pippin directed Colonel Hodgson to make institution-wide changes to the shift assignments at OCI. *Id.* at ¶¶ 62-65. As a result, approximately 44 corrections officers had their work shifts changed, the majority of whom were Caucasian, and 4 of whom were African-American. *Id.* at ¶ 66. As it more directly concerned Williams, fourteen senior or sergeant corrections officers had their shifts changed, among whom Williams was the only African-American. *Id.* Williams' shift was changed to the midnight shift (11:00 pm to 7:00 am). Officer Joel Taylor, who held the same supervisory authority as Williams, had his shift changed as well.[8] Williams and Taylor, as sergeant correctional officers, had supervisory authority over the C-Dorm and D-Dorm,

---

[7] The DOC had determined an "emergency situation" to exist at OCI due to the extent of contraband that was found. Doc. 94 at ¶¶ 43-44.

[8] It does not appear that the record specifies what shift Taylor was changed to, but Williams stated in his deposition that Taylor was put on a day shift. Doc. 126-1 at 30.

respectively, and both of these dorms were found to have been active in the introduction of drugs and contraband into the facility.

As a further measure to guard against the drug activity, Pippin recommended, and Regional Director Whitehurst approved, the transfer of several correctional officers to other institutions. *Id.* at ¶¶ 70-79. Officers Williams and Taylor were among those transferred, and with particular regard to them, Pippin felt they should have been aware of the drug activity in the dorms they supervised, yet had reported none. *Id.* at ¶¶ 74, 78. Conversely, some of the other officers, senior or otherwise, because they had either been particularly responsive to the increased searches or they had reported suspicious behavior in the dorms. *Id.* at ¶¶ 76-77. In all, eight officers were transferred to other facilities, six of whom were Caucasian and two of whom were African-American. *Id.* at ¶ 79. On August 3, 2007, while Williams was still on active duty with the Army Reserve, he was informed over the telephone by Assistant Warden James Watson that he was being transferred to the Santa Rosa Correctional Institution ("SRCI") and that he was to report to work there on Monday, August 6, 2007.[9] When Williams asked why, he was told that they needed "new blood" at OCI. Doc. 126 at ¶ 18.

Williams was laterally reassigned to essentially the same job position and title at SRCI which is less than 50 miles from OCI. Williams did not move his residence because of the

---

[9] Because Williams was on Army Reserve duty at the time the shift changes at OCI were implemented, it would appear that he never had to actually work any of the midnight shifts he was switched to.

transfer, although his commute to work substantially increased. At SRCI, Williams was put on the midnight shift, whereas Taylor, who was similarly transferred to SRCI, received a day shift. A transitions class was available at SRCI, but at the time of Williams' transfer, another correctional officer was teaching the course. In the spring of 2008, however, the instructor position became available, and Williams was given the position.

On August, 6, 2007, after receiving news of the transfer, Williams filed a "Career Service Grievance" regarding his shift change and subsequent transfer to SRCI. Doc. 100, ex. 3. In the grievance, Williams questioned whether the stated reason for these moves, the need for "new blood" at OCI, was a valid reason under DOC regulations. Williams also asserted that he did not receive sufficient notice in advance of these moves as provided in the regulations. *Id.* On August 10, 2007, a hearing held on the grievance, wherein Williams also brought up the incident where he was refused entry into OCI to teach his transitions class. Additionally, Williams asserted at the hearing that Colonel Hodgson had treated him unprofessionally and in a discriminatory manner. Warden Pippin asked him to provide details, and three days later Williams submitted his complaints in written form. Williams provided that "Hodgson verbally threatened me while repeatedly pointing his finger at me with threats under hostile, discriminatory terms and conditions regarding my shift change, post assignment, and taking away my employment as Transitions Facilitator at OCI." Doc. 100, ex. 11. In deposition testimony, Williams stated that he felt at the time Hodgson's

conduct was discriminatory because Williams felt singled out because the shift changes were done unfairly, particularly against him. Doc 126-1, Williams deposition at 29.

Plaintiff subsequently filed his claim with the EEOC and then this federal action.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 249, 106 S. Ct. at 2510–11; *see also Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993) (finding that a court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party" when determining whether a genuine issue exists).

The party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Only when the moving party has discharged this initial burden does the burden shift to the nonmoving party to demonstrate there is a genuine issue of material fact precluding summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160–61, 90 S. Ct. 1598, 1610, 26 L. Ed. 2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

### III. Discussion

**Discrimination Claim**

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).

A claim under Title VII may be established by presenting direct evidence of discriminatory intent or by presenting circumstantial evidence of discrimination according to the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Walker v. Nations Bank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995). As Plaintiff acknowledges, he cannot provide direct evidence of discrimination; therefore, he must use the *McDonnell Douglas* framework to establish his claim. Under the well-established three pronged analysis, Plaintiff has the initial burden of

proving by a preponderance of the evidence a *prima facie* case of disparate treatment in the workplace. Circumstantially, he must show that "(1) he belongs to a protected class; (2) he was subjected to adverse job action, (3) his employer treated similarly situated employees outside his classification more favorably, and (4) he was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory explanation for the adverse action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). If the employer can do so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reason offered by the defendant was not the real reason for the adverse employment action. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998). Plaintiff may accomplish this by demonstrating either that the discriminatory motive more likely caused the adverse action or that the employer's explanation for the action is "unworthy of credence." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981).

Plaintiff fails on the second prong of the standard in that he cannot show that he was subjected to adverse job action. In order to qualify as adverse, an employment action must involve a significant change in the employee's work status, such as a firing, a failure to hire or promote, a reassignment with significantly different job responsibilities or a decision causing a significant change in benefits. *See Webb-Edwards v. Orange County Sheriff's*

*Office*, 525 F.3d 1013, 1031 (11th Cir. 2008) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Thus, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001); *see also Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998). Federal courts are not designed to "second-guess the business judgment of employers" or "sit as a super-personnel department that reexamines an entity's business decisions." *Davis*, 245 F.3d at 1238 (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)).

Thus, a change in one's job duties rarely amounts to a tangible enough harm to qualify as an adverse employment action. *See id.* at 1244-1245 (citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997). Accordingly, lateral transfers resulting in no loss of pay, classification or benefits fall short of the mark. *Polite v. Dougherty County School System*, 314 Fed.Appx. 180, 183-84 (11th Cir. 2008); *Maniccia v. Brown*, 171 F.3d 1364, 1370, n. 3 (11th Cir. 1999); *Smith v. Alabama Dept. of Public Safety*, 64 F.Supp. 2d 1215 (M.D. Ala. 1999); *Smith v. Upson Co., Ga.*, 859 F.Supp. 1504, 1510 (M.D. Ga. 1994). Thus a transfer in location that does not otherwise affect the employee's job position or title does not establish adverse action. *See Smith v. Alabama Dept. of Public Safety*, 64 F.Supp. 2d at 1222; *see also Polite*, 314 Fed.Appx. at 183-84 (transfer from one county school to another held not to be an adverse employment act). While a transfer over a great distance might qualify, transfers that simply increase the distance of the employee's commute do not.

*See Johnson v. TCB Constr. Co.*, 334 F. App'x 666, 671 (5th Cir. 2009); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989); *Smith*, 64 F.Supp. 2d at 1222. Likewise, a change in work assignment or alteration in one's work shift do not qualify as an adverse action, even if the new assignment or shift may seem less prestigious. *See Davis*, 245 F.3d at 1245 (holding that only in unique circumstances where the change is so substantial and material as to "indeed alter the terms, conditions, or privileges of employment" could an assignment change be seen as adverse); *Braswell v. Allen*, 586 F.Supp.2d 1297, 1306-07 (M.D. Ala. 2008) (transfer from day shift to overnight shift held not to be adverse since it was unaccompanied by any change in the terms of the plaintiff's employment).

With the above standards in mind, the Court finds that Plaintiff's transfer to the midnight shift and subsequent transfer to SRCI fails to establish that he was subjected to adverse employment action. As in the cases uniformly cited above, Plaintiff's transfer involved no alteration in his salary, classification or work status. As far as physical location, Plaintiff can complain only about an increase in commuter time. His job changes were simply lateral transfers and as such do not qualify as adverse employment action.

The Court also finds that, even if Plaintiff' transfers were adverse, his claim would fail under the third prong of the standard because he cannot establish that Defendant treated similarly situated employees outside his classification differently. As Defendant recounts, shift reassignments were performed on a whole scale basis, and then several employees at

OCI in addition to Plaintiff were transferred to other facilities. Both groups of affected employees were mixes of individuals with Caucasian, African-American and other ethnic backgrounds, and no one race or ethnicity appears to have been treated favorably over the other. Plaintiff was simply one of this mix, in what appeared to prison officials to be a necessary solution to the drug and contraband problem at OCI. Though Plaintiff may question the propriety of the decisions made, the reasons why he was included among those slated for transfer, or whether he received adequate notice of these actions, he nevertheless cannot establish circumstantially that any of the actions were discriminatory. Title VII does not guard against employers making questionable personnel decisions, it only guards against them making discriminatory ones. Accordingly, Plaintiff's Title VII claim fails.[10]

**Retaliation Claim**

42 U.S.C. § 2000e-3(a) makes it unlawful for an employer to discriminate against an employee for raising an administrative charge under Title VII. Claims of retaliation under this section undergo the same burden-shifting analysis as discrimination claims. Plaintiff must first establish by a preponderance of the evidence a *prima facie* case by showing: (1) participation in a statutorily protected activity; (2) an adverse action against the employee; and (3) a causal connection between the protected activity and the adverse action. *See*

---

[10] Since the same analysis used in Title VII claims governs those raised under the FCRA, *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998), Plaintiff's FCRA fails as well.

*Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). In order to meet this burden, Plaintiff must establish that the employer was actually aware of the administrative charge when it took adverse employment action. *Id.* If Plaintiff establishes a *prima facie* case, the defendant must come forward with a legitimate non-retaliatory reason for the employment action. If such a reason is offered, Plaintiff must prove by a preponderance of the evidence that the reason is pretextual and that the real reason was retaliatory. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2747-49, 125 L. Ed. 2d 407 (1993).

For the same reasons as discussed with his discrimination claim, Plaintiff cannot sustain his claim of retaliation because he has failed to establish adverse action taken against him. *See Polite*, 314 Fed. Appx. at 183-84 (finding lateral transfer of employee teacher to another school, allegedly taken in retaliation, to not be an adverse action). Thus, Plaintiff fails to meet the second prong of the standard.

As it also parallels his discrimination claim, the fact that Plaintiff's shift reassignment and institutional transfer were part of a broad-based effort to combat the contraband problem at OCI factors against him proving the third prong of his retaliation claim. Plaintiff can hardly contend that he was singled out for adverse treatment when numerous other employees underwent the same or similar job assignment changes that he did. Moreover, it bears noting that the job changes were instituted before Plaintiff filed any grievances. Thus, the only protected conduct Plaintiff can causally connect to Defendant's employment actions was his

informal discussion with his shift commander regarding the incident with Colonel Hodgson, which appeared not to contain racial animus and was not even the thrust of Plaintiff's later grievances. Thus, the attempted linkage between Plaintiff's protected activity and any action by Defendant is too attenuated to form the necessary causal nexus.

IV. SUMMARY

The evidence, when read in the light most beneficial to Plaintiff, shows that there is no genuine issue of material fact and that Defendant is entitled to summary judgment as a matter of law. The Court's ruling in this matter may therefore be summarized as follows, and **IT IS HEREBY ORDERED:**

1. Plaintiff's motion to strike (doc. 127) is **DENIED.**

2. Defendant's motion for summary judgment (Doc. 110) is **GRANTED**.

3. Consistent with this order, the Clerk of Court is directed to enter summary judgment in favor of Defendant. Plaintiff shall take nothing further by this action and goes without day.

**ORDERED** on this 22nd day of March, 2011.

s/ *L.A. Collier*
Lacey A. Collier
Senior United States District Judge